UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SCOTT BELKNAP, III,

       Plaintiff,

v.                                    Case No. 05-73323

J.B. HUNT TRANSPORT, INC.,
and EARL A. DEDRICK, jointly and        HONORABLE AVERN COHN
severally,

       Defendants.

_____/


## MEMORANDUM AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is a tort case arising out of an automobile accident. Plaintiff Scott Belknap is suing defendants J.B. Hunt Transport, Inc. (J.B. Hunt) and Earl A. Dedrick (collectively, defendants) for negligence resulting from a car/truck collision in which Dedrick rear-ended Belknap.

Before the Court is defendants' motion for summary judgment essentially on the grounds that Belknap's alleged injuries are not recoverable under Michigan's no-fault statute. The Court held a hearing on the motion at which it directed the parties to engage in additional discovery and file supplemental papers, as will be explained. The matter is now ready for decision. For the reasons that follow, the motion will be granted.

### II. Background

The material facts as gleaned from the parties' papers follow.

On September 1, 2004, Belknap was traveling southbound on I-75 in Detroit. Dedrick, driving a truck owned by J.B. Hunt, rear-ended Belknap when Belknap slowed for traffic. Belknap was able to get out of his vehicle and Belknap did not immediately

need medical assistance.  However, Belknap says he felt dazed and confused and requested that police officers take him home to rest.  Later that evening, Belknap began experiencing lower back and shoulder pain and was treated at Oakwood Hospital Emergency Room ("Oakwood").  The reports from Oakwood show that Belknap reported feeling dazed.  Belknap was diagnosed with lumbar and left shoulder strains. When he was discharged, Belknap was given pain medications and instructions to see his family physician.

On September 3, 2004, Belknap was evaluated by his family physician, Dr. Florence Sri-Tharan.  Dr. Sri-Tharan diagnosed Belknap with left shoulder and lumbar sprains and gave instructions that Belknap could return to work on September 13, 2004. On October 25, 2004, Belknap was evaluated for physical therapy by Dr. Peter Samet. Dr. Samet recommended physical therapy for Belknap's left shoulder, neck and lower back pain and gave instructions that Belknap would be unable to return to work until November 25, 2005.

On December 9, 2004, Belknap was seen at Oakwood for disorientation, light-headedness and ringing in his ears.  While Belknap did not have a comprehensive evaluation, the cognitive evaluation that was done was within normal limits.  A CT of the head was also normal.  The clinical impression of the attending physician was dizziness, acute vertigo, confusion, and tinnitus.  Belknap left Oakwood without being given any restrictions.

On November 5, 2004, an EMG of the cervical spine revealed no evidence of cervical radiculopathy.  On November 12, 2004, an EMG revealed right L5-SI radiculopathy.  An MRI of the spine on December 20, 2004 revealed that the radiculopathy did not result in central canal or neural foraminal stenosis.

Belknap continued to receive physical therapy for his left shoulder and lower back pain and by Dr. Samet's orders, Belknap was disabled from work until December

2

5, 2004.

On February 10, 2005, Belknap was evaluated by Dr. Paul Shapiro. An MRI of the left shoulder suggested a possible partial thickness rotator cuff tear. X-rays revealed degenerative changes at the AC joint. Dr. Shapiro recommended surgery.

On February 16, 2005, Belknap was evaluated by Dr. Hi Joo Kim. Dr. Kim evaluated Belknap's complaints of right hand and lower back pain and found that this pain was not attributable to the injuries incurred by the accident. However, Dr. Kim said that Belknap's left shoulder injury was related to the accident. Dr. Kim said that Belknap could return to work with restrictions and would not need physical assistance in daily living.

On February 25, 2005, Belknap was evaluated at the Michigan Ear Institute after complaining of dizziness and ringing in his ears. Dr. Michael J. LaRouere noted that Belknap had had significant noise exposure in the Navy and that Belknap currently used firearms. Dr. LaRouere's impression was tinnitus, positional vertigo and high-frequency bilateral sensorineural hearing loss, but LaRouere did not give a medical leave from work. Belknap was seen by Dr. LaRouere three more times. Each time, DrD. LaRouere reported that Belknap was better, even though his tinnitus persisted. An ENG performed on October 28, 2005 was normal and Belknap stopped seeing LaRouere in October 2005.

On March 4, 2005, Belknap underwent arthroscopic rotator cuff repair of his left shoulder. On March 10, 2005, Belknap said that he was "doing well without complaints". On April 14, 2005, Dr. Shapiro reported that Belknap was "doing very well" and that the surgery had produced an "excellent result". On May 26, 2005, Dr. Shapiro said that Belknap could return to work with restrictions. Belknap finished his physical therapy on June 17, 2005.

In April 2005, Belknap was evaluated at Spectrum Rehabilitation Centers ("SRC")

3

by Dr. Bradley Sewick, a neuropsychologist.  Dr. Sewick diagnosed Belknap with probable resolving post-concussion syndrome secondary to head trauma from the accident and adjustment disorder secondary to the injuries sustained during the accident.  Dr. Sewick encouraged Belknap to return to work.

On June 10, 2005, Robert Nettleman, a psychologist with SRC, restricted Belknap from working for 90 days due to cognitive and emotional symptoms. However, neither Nettleman nor Dr. Sewick imposed any additional physical restrictions.

Belknap returned to work on September 19, 2005 with no further physician-imposed work restrictions related to the alleged head injury, but continued to receive cognitive rehabilitation at SRC.

Belknap says that he experienced back pain on and off until February or March 2005.  Belknap also says that Dr. Shapiro gave him a "clean bill of health" for his left shoulder injury by June 2005.  By the middle of July 2005, Belknap reported that his dizziness was greatly improved.  After June 2005, Belknap was able to resume his pre-accident recreational activities with no physician-imposed restrictions and do most of his household chores.  However, Belknap says he is unable to participate in his pre-accidental recreational activities at the same level as he did prior to the accident.  For example, Belknap says he missed several Masonic Lodge meetings and was unable to fulfill all of his duties with the group.

On January 31, 2006, Belknap was seen by Dr. Shapiro.  An X-ray of his right hand showed carpometacarpal (CMC) osteoarthritis with carpal tunnel syndrome.  On February 22, 2006, Dr. Shapiro performed CMC arthroplasty.  Dr. Shapiro said he expected Belknap to return to work around April 26, 2006.

At the time Belknap's response to this motion was filed, Belknap had returned to work in a limited capacity, but he says that his injuries have caused him to miss opportunities to earn merit and performance bonuses.

4

III.  Legal Standards

A.  Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

B.  No-Fault Law[1]

1.  Serious Impairment of Body Function

A person may be subject to third party tort liability for non-economic damages only if the injured person "suffered death, serious impairment of body function, or permanent serious disfigurement."  M.C.L. § 500.3135(1).  A "serious impairment of body function" means an "objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life."  M.C.L. § 500.3135(7).

Whether a plaintiff has suffered a serious impairment of body function or

---

[1] Because the basis for the Court's jurisdiction is diversity, the Court must apply the substantive law of Michigan as interpreted by the Michigan Supreme Court. Reid v. Volkswagen of America, Inc., 575 F.2d 1175, 1176 (6th Cir. 1978).

5

permanent serious disfigurement is a question of law if the court determines "that there is no factual dispute concerning the nature and extent of the person's injuries." M.C.L. §500.3135(2)(a)(I).  If there is factual dispute, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement, the Court can decide the question as a matter of law. M.C.L. § 500.3135(2)(a)(ii).

The framework for determining whether an injury meets the requirements of M.C.L. § 500.3135(1) was established by the Michigan Supreme Court in Kreiner v. Fischer, 471 Mich. 109, 132 (2004).  Under Kreiner, a court must first determine whether an important body function has been impaired, rather than merely injured. . The impairment must be objectively manifested; subjective complaints that are not medically documented are insufficient.  Kreiner, 471 Mich. at 132.  If an objective manifestation exists, the Court must then engage in an objective analysis to see whether the accident has affected the plaintiff's "general ability" to conduct the course of his life."  Kreiner, 471 Mich. at 133.  In determining this, courts look at: (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; and (e) the prognosis for eventual recovery.  Kreiner, 471 Mich. at 133.  The inability to lead a normal life requires more than a minor interruption, and the effect of the impairment on the course of the plaintiff's entire normal life must be considered.  Kreiner, 471 Mich. at 131.  Despite some interruptions, if the course of the plaintiff's normal life has not been affected, then the general ability to lead a normal life has not been affected.  Kreiner, 471 Mich. at 131.


2.  Serious Neurological Injuries

An exception exists for "serious neurological injuries." under M.C.L. §

500.3135(2)(a)(ii), which provides that "[f]or a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury." M.C.L. § 500.3135(2)(a)(ii).

### III.  Analysis

#### A.  Parties' Arguments

Defendants argue that summary judgment is appropriate because:  (1) there is no genuine issue of material fact about whether Belknap's injuries constitute a serious impairment of body function; (2) there is no genuine issue of material fact as to whether Belknap sustained a serious neurological injury; and (3) there is no question that Belknap is not entitled to recover economic losses because is able, and will likely continue to be able past the three year limitation, to return to full working capacity.

Belknap says there are genuine issues of material fact as to whether he suffered a serious bodily impairment, whether he sustained a serious neurological injury, and whether he is entitled to recover economic damages.

#### B.  Whether Belknap Sustained a Serious Impairment of Body Function

##### 1.

Defendants say that Belknap's injuries do not qualify as serious impairments of body function because the injuries have not affected his general ability to lead his normal life.  Defendants came to this conclusion because: (1) Belknap no longer experienced lower back pain as of February/March 2005 and was given a clean bill of health for his left shoulder injury on June 1, 2005 and (2) after June 2005, Belknap was able to enjoy his pre-accident recreational activities at some capacity, perform most of his household chores and attend meetings and activities at the Masonic Lodge. In Kreiner, the testimony of a carpenter that he could no longer stand on a ladder for greater than 20 minutes, work beyond six hours, lift greater than 80 pounds, walk

7

beyond a half mile or hunt rabbits was found insufficient to show that the carpenter's genera; ability to lead his normal life had been affected. 471 Mich. at 137.

Similarly, defendants say Belknap's general ability to lead his normal life has not been affected merely because certain activities are more difficult or because certain activities have been curtailed by self-imposed restrictions because "minor changes in how a person performs a specific activity may not change the fact that the person may still 'generally' perform that activity." Kreiner, 471 Mich. at 131.  A self-imposed restriction, as opposed to a physician-imposed restriction is insufficient to show a diminished general ability to lead a normal life. Kreiner, 471 Mich. at 133, n.17.

Defendants also say that the accident has not significantly affected Belknap's employment.  Although Belknap missed some time from work, defendants say that this is insufficient to show that the course or trajectory of Belknap's daily life has been affected because Belknap has been able to return to his position as master manual modeler at Ford Motor Company and can potentially qualify for any merit pay increases.

Belknap says that his injuries have changed the course and trajectory of his life. He says he has not been able to "effectively" return to his position as a master modeler and is still under the care of Drs. Samet and Shapiro and occupational therapists.  In addition, he says he has lost opportunities to earn performance bonuses due to his inability to maintain a regular schedule or work to his normal (pre-accident) productivity levels.

2.

The Court agrees with defendants.  Considering all of the medical evidence outlined above, the effects of Belknap's injuries are not serious enough to affect his ability to lead his normal life.  In other words, they do not constitute a serious impairment of body function.  Viewing the evidence in a light most favorable to Belknap, he appears to have suffered a lower back, left shoulder, right hand, and a possible

8

2:05-cv-73323-AC-MKM   Doc # 34   Filed 02/06/07   Pg 9 of 15   Pg ID 1005

closed-head injury (discussed below).  While Belknap received medical attention for these conditions, he is currently able to participate in most of his pre-accident activities. He has been able to return to work as a master modeler.  The fact that he finds certain activities, such as bike riding and shooting, more difficult, or is limited in his ability to participate in his pre-accident employment and hobbies is sufficient to show an inability to lead his normal life.  "Minor changes in how a person performs a specific activity may not change the fact tat the person may still 'generally' perform that activity."  <u>Kreiner</u>, 471 Mich. at 131.  In addition, there appears to be few, if any physician-imposed restrictions remaining on Belknap's activities.  The Michigan Supreme Court has said that a self-imposed restriction, as opposed to a physician-imposed restriction, is insufficient to show a diminished general ability to lead a normal life.  <u>See</u> <u>Kreiner</u>, 471 Mich. at 133 n. 17.

The fact is that in <u>Kreiner</u>, the Michigan Supreme Court set a high standard for what constitutes a serious impairment of body function.  The plaintiff in <u>Kreiner</u> testified that he could no longer stand on a ladder for greater than 20 minutes, work beyond six hours, lift greater than 80 pounds, walk beyond a half mile or hunt rabbits.  The Michigan Supreme Court held that such restrictions were not sufficient to establish a serious impairment of body function.  Here, Belknap has been able to resume working and participate in his pre-accident hobbies and activities in some capacity.  Thus, he is able to function with less restrictions than those in <u>Kreiner</u>.

The Court is constrained to observe that after <u>Kreiner</u>, there is a spectrum of these cases as to what constitutes a serious impairment of body function.  Judges can and do differ on this issue.  <u>See Isbell v. Haight</u>, No. 269249 (Mich. Ct. App. Jan. 16, 2007) (unpublished).  Here, the Court is satisfied that Belknap's injuries simply do not rise to the threshold of serious impairment of body function.

C.  Whether Belknap Sustained a Serious Neurological Injury

1.

Defendants argue that Belknap has not satisfied the requirements of the "serious neurological injury" exception of M.C.L § 500.3135(2)(a)(ii).  Defendants argument is based on an attack on Dr. Samet's affidavit as to Belknap's injuries.

Belknap says that Dr. Samet, who is a licensed physician who regularly diagnoses and treats closed head injuries, states Belknap "may have suffered a serious neurological injury" and therefore this automatically establishes a question of fact as to whether he suffered a serious neurological injury.

At the hearing, the Court directed defendants to take Dr. Samet's deposition and then file supplemental papers further detailing their arguments as to whether Belknap suffered an serious neurological injury in light of Dr. Samet's testimony.  These supplemental papers are the focus for resolution of this issue.

2.

As noted above, Michigan law provides that "[f]or a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury."  M.C.L. § 500.3135(2)(a)(ii).

The "serious neurological injuries" exception requires "more than a diagnosis that a plaintiff has sustained a closed-head injury."  Churchman v. Rickerson, 240 Mich. App. 223, 229 (2000).  In the summary judgment context, "the plain language of the statute requires some indication by the doctor providing testimony that the injury sustained by the plaintiff was severe."  Churchman, 240 Mich. App. at 229.

In relevant part, Dr. Samet opined in his affidavit as follows:

> 4.      Based on history taken from Mr. Belknap, my review of his medical records, my complete medical evaluation as well as my education and experience in treating and diagnosing closed head injuries, it was an is my belief that Mr. Belknap may have sustained a serious neurological injury, and in fact, did sustain a traumatic brain injury in the automobile collision of September 1, 2004.

10

4.    [sic]  Based on this injury, Mr. Belknap suffered vertigo, headaches, balance problems, decrease in concentration, problems with short term memory as well as anxiety.

At the hearing, the Court expressed some concern with the conclusory nature of the affidavit, and therefore directed that Dr. Samet's deposition be taken in order to uncover the bases for Dr. Samet's opinion.  Thus, the Court need not decide whether Dr. Samet's affidavit, standing alone, is sufficient to establish a jury question on the issue of whether Belknap suffered a "serious neurological injury," although there is some basis for to find that it is not.  See McDonald v. Vaughn, 2004 WL 1103926, 2 (Mich. App. May 18, 2004) (affidavit of doctor which stated "[plaintiff] has been diagnosed with a closed head injury which may be a serious neurological injury" did not comply with the statute because the "affidavit did not contain any facts or details showing that plaintiff suffered an objectively manifested impairment of any important body function that affected her general ability to lead a normal life.")

The statute requires that "there may be a serious neurological injury."  As defendants point out, the statutory language -- "may be a serious neurological injury" -- is written in the present tense.  Belknap argues that a past sustained injury qualifies as a "serious neurological injury," however, this argument is not supported by the language of the statute or the legislative history.  The first amendment which created the exception provided that a "neurological injury exists."  See H-1 Amendment of H.B No. 4341  Senator Rogers - Exhibit D to defendant's reply brief. .  Belknap cites Byer v. Smith, 419 Mich. 541 (1984).  In Byer, the Court found that a plaintiff may recover damages for a past serious impairment, the holding was based on the "serious impairment of body function" exception.  The statutory language for this exception provides that a person may recover damages if the person "has suffered" a serious impairment.  Moreover, Bryer was decided 20 years before Kreiner, which requires that the injury affect a person's "general ability to leads his normal life," arguably implying

11

that the injury must be present.

The requirement that a neurological injury must presently exist is consistent with case law further defining the statutory language.  In <u>Churchman</u>, the Michigan Court of Appeals set forth the definition and requirements for what constitutes a "serious neurological injury," stating that the injury must be "dangerous; potentially resulting in death or other severe consequences."  <u>Churchman</u>, 240 Mich. App. at 229-30. A present an continuing injury comports with the severe injury envisioned by the court of appeals.

Belknap does not have any evidence of an existing neurological injury.  To the contrary, Dr. Samet testified that Belknap <u>had</u> suffered a serious neurological injury:

> Q:    Is it your opinion that Mr. Belknap suffered a serious neurological injury working with the definition in <u>Churchman</u>?
> A:    Yes.
>
> ...
>
> Q:    [S]itting here today, would it be fair to say you can't say whether Mr. Belknap today on July 21, 2006 has a serious neurological injury?
> A:    I can't say for sure presently.
> ...
> Q:    Would you agree that it's -- that he may not have sustained a neurological injury according to your own affidavit?
> A:    It could be possible, yes.
> Q:    And when you say may have sustained, are you indicating there that he had had this previously and that he's recovered from it when you uses the word sustained?
> A:    It sounds like an issue of linguistics.  I believe that he may have recovered...

Based on this testimony, Belknap cannot establish that he currently suffers from a serious neurological injury.  As such, defendants are entitled to summary judgment.

Moreover, an examination of Dr. Samet's testimony regarding the basis for his opinion also reveals that summary judgment is appropriate.  Dr. Samet stated in his affidavit that his opinion was based on (1) Belknap's medical history, (2) his review of his medical records for Belknap and (3) Dr. Samet's "complete medical evaluation," and (4) diagnosis of "vertigo, headaches, balance problems, decrease in concentration,

problems with short term memory and anxiety."  As defendants point out in their supplemental paper, the medical history Dr. Samet refers to is a handwritten note from February 11, 2005 which states in part;  "Family noticing mood swings, decreased memory since motor vehicle accident, possible traumatic brain injury, will have patient see Dr. Sewick."  Prior to this note, there is no reference to a head-related complaint. Moreover, after the February 11, 2005 visit, there are no other notes regarding a head injury.  Dr. Samet also testified that although he has authored several disability letters on behalf of Belknap, none of them refer to an alleged head injury.

With regard to Dr. Samet's review of Belknap's medical records, his initial evaluation on October 25, 2004 reveals that Belknap denied any problems with his head.  Dr. Samet admitted that in the ensuing months and years, he never personally evaluated or treated Belknap for a head injury.  At the time of his deposition, Dr. Samet had not seen Belknap for a few months and most recently for injuries to Belknap's thumb, shoulder, and wrist.

As to Dr. Samet's review of Belknap's records from other doctors, Dr. Samet's file consists of records from Dr. Shapiro and two reports from Dr. Sewick.  Dr. Shapiro's orthopedic records are not relevant.  Dr. Sewick's report only diagnoses "probably resolving post-concussion syndrome" and nowhere suggests that Belknap suffered a serious head injury or that Belknap even had a closed head injury.  When questioned on this point, Dr. Samet responded that while Dr. Sewick never diagnosed a closed head injury, Dr. Sewick used the term "trauma" which he assumed to be a closed head injury. Dr. Samet also stated he could not recall having any discussions with Dr. Sewick regarding any closed head injury.  Indeed, Dr. Samet's only involvement with Belknap's head injury is his referral to Dr, Sewick.  Dr. Samet was also unaware of medical records relevant to Belknap's cognitive functioning.  Specifically, he stated he was an aware of an inner ear test which showed Belknap's balance was normal and that two

ENGs (taken on July, 14, 2005 and October 28, 2005) yielded normal results.

Finally, as to Belknap's alleged vertigo, balance problems, decrease in concentration, short term memory problems and anxiety as a basis for Dr. Samet's opinion, as discussed above, there is no evidentiary support for these alleged conditions. Dr. Samet was unable to testify as to whether Belknap continues to have such problems. Indeed, other than the February 11, 2005 note that Belknap's family noticed problems with him, there is no mention of any memory problems in Dr. Samet's medical records. Indeed, according to Belknap's deposition, which Dr. Samet admits he did not review, Belknap is able to drive, make decisions about his medical care, is not restricted from working, is able to engage in recreational activities such mountain biking and shooting. This activity is inconsistent with a serious neurological injury as the Court views it.

Overall, there is insufficient evidence in the record to make out a triable issue as to whether Belknap suffered a serious neurological injury.

### 3. Economic Losses

Defendants also argue that Belknap is not entitled to recover for economic damages for loss of income in tort because he has been fully reimbursed for all lost income and is unlikely to lose more than three years of income from work as required by M.C.L. § 500.3107. In light of finding that Belknap fails to establish a genuine issue of material fact as to whether he suffered a serious impairment of body function or a serious neurological injury, it is not necessary to decide this issue.

### IV. Conclusion

14

For the reasons stated above, defendants' motion for summary judgment is GRANTED.  This case is DISMISSED.

SO ORDERED.


 s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  February 6, 2007


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, February 6, 2007, by electronic and/or ordinary mail.

 s/Julie Owens_____
Case Manager, (313) 234-5160

15